UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
TRANSPORTATION INSURANCE
COMPANY and TRANSCONTINENTAL
TECHNICAL SERVICES, INC. (now known
as RSK Co. Claims Services Inc.),

       Plaintiffs,       **ORDER AND DECISION**

    -against-        CV 01-1341 (ARL)

STAR INDUSTRIES, INC.,

       Defendant.
------------------------------------------------------------X
STAR INDUSTRIES, INC.,

       Third-Party Plaintiff,

    -against-

ESSENTIAL SERVICES & PROGRAMS,
INC.,

       Third-Party Defendant.
------------------------------------------------------------X

**LINDSAY, Magistrate Judge:**

  Presently before the court is a summary judgment motion by plaintiffs Transportation Insurance Company, Inc. ("TIC") and Transcontinental Technical Services, Inc. ("TTS") (together, "CNA") pursuant to Rule 56 of the Federal Rules of Civil Procedure seeking summary judgment against the defendant Star Industries, Inc., ("Star"). For the reasons set forth below, CNA's motion is **DENIED.**

**FACTUAL BACKGROUND**

  Plaintiff TIC issued three one-year policies of workers' compensation insurance (the "Policies") to Star covering the periods November 28, 1992 to November 28, 1993, November

28, 1993 to November 28, 1994, and November 28, 1994 to November 28, 1995. (CNA's Compl. at ¶ 7; Star's Answer at ¶ 4). These Policies provided for insurance coverage for Star's obligations under the workers' compensation and employer liability statutes in various states, including New York. (CNA's Compl. at ¶ 8; Star's Third-Party Compl. at ¶ 7). The Policies provided for a "retrospective premium," in which Star's premium obligations were based, in part, on Star's past claims and loss experience. (CNA's Compl. at ¶ 9; Star's Third-Party Compl. at ¶ 9). Accordingly, the actual premiums charged to Star were to be calculated after the policy coverage term. (Id.).

TTS entered into Claims Service Agreements (the "Claims Service Agreements") with Star pursuant to which TTS would service the Policies issued by TIC from November 28, 1992 through November 28, 1995. (CNA's Second Supplemental and Amended Compl. at ¶ 10; Star's Third-Party Compl. at ¶ 10). On March 5, 2001, CNA commenced this action against Star seeking to recover outstanding amounts allegedly due from Star pursuant to the terms of the Policies and the Claims Service Agreements. (See generally, CNA Compl.). CNA claims that despite its demand, Star has refused to pay the premiums allegedly due to TIC under the Policies and monies due to TTS under the Claims Service Agreements. (CNA Compl. at ¶¶ 11-12). According to CNA, as of June 1, 2003, there is $2,622,062 due under the Policies and the Claims Service Agreements. (CNA's Second Supplemental and Amended Compl. at ¶ 19). Star denies the allegations and asserts counterclaims alleging *inter alia* that TIC billed and collected premiums from Star in excess of what it is entitled to under the Policies and that TTS breached the Claims Service Agreements by failing to service the claims as provided in the Claims Service Agreements. (Star's Answer at ¶¶ 25-29). CNA denies these allegations. (See generally, CNA's

Answer to Star's Counterclaims).

# DISCUSSION

## I. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). The burden is on the moving party to establish the lack of any factual issues. Id. The very language of this standard reveals that an otherwise properly supported motion for summary judgment will not be defeated because of the mere existence of some alleged factual dispute between the parties. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505 (1986). The requirement is that there be no "genuine issue of material fact." Id. at 248, 106 S. Ct. at 2510.

The inferences to be drawn from the underlying facts are to be viewed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S. Ct. 1348, 1356 (1986). When the moving party has carried its burden, the party opposing the summary judgment motion must do more than simply show that "there is some metaphysical doubt as to the material facts." Id. Under Rule 56(e), the party opposing the motion "may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing there is a genuine issue for trial." Anderson, 477 U.S. at 248, 106 S. Ct. at 2510.

## II. Star's Liability for Allegedly Unpaid Premiums to TIC and TTS

As previously stated, CNA alleges that Star has breached its contracts by failing to pay the premiums due to TIC and TTS under the Policies and Claims Service Agreements at issue. (Compl. at ¶ 11).[1] Star has not provided any evidence of payment of the monies sought by CNA. Rather, Star argues that the plaintiffs are barred from any recovery because they have each breached the contracts upon which their respective claims are based. (Ans. at ¶ 17). Each of these arguments is analyzed below.

### A. TIC's Breach of Contract Claim for Premiums Due Under the Policies

CNA claims that Star owes $ 3,327,062 for premiums due on the Policies. (Peterson Aff. at ¶¶ 45, 54, 59, 71, 95 and 108).[2] Star denies CNA's claim and asserts that any claim under the 1992-93 Policy is barred by the statute of limitations. (Star Mem. at p. 20). Star further asserts that CNA's calculations are incorrect. (Kogel CNA Aff. at ¶¶ 5-53).[3] More specifically, Star claims that there are several errors in the calculations performed by CNA. First, Star claims that CNA's calculations are incorrect because they exclude charges for taxes and assessments from

---

[1]Plaintiffs also allege a common law claim for money due and owing under both the Policies and Claims Service Agreements (Compl. at ¶¶ 18-19). However, since the breach of contract claim arises from the same Policies and Claims Service Agreements, the court will not undertake a separate analysis of the claim for money due and owing. The determination of the breach of contract will necessarily resolve whether there is "money due and owing." See Eastside Food Plaza, Inc. v. "R" Best Produce, Inc., No. 03-CV-106 (SAS), 2003 WL 21727788, *5 (S.D.N.Y. July 23, 2003) (citations omitted) (claim for money due and owing requires the plaintiff to prove that the "defendant had an express legal obligation to pay the monies due and owing.").

[2]"Peterson Aff. at ¶ __" refers to the affidavit of Daniel J. Peterson submitted in support of CNA's motion for summary judgment.

[3]"Kogel CNA Aff. at ¶__" refers to the Affidavit of V. Michael Kogel submitted in opposition to CNA's summary judgment motion.

the maximum premium calculation. (Id. at ¶¶ 43-44). Second, Star claims that CNA's calculations are incorrectly based on incurred losses and that the Policies provide for such calculations to be based on actual paid losses. (Id. at ¶¶ 34-42). Third, Star argues that the premiums sought by CNA are inflated as a direct result of CNA's mismanagement of claims because the retrospective adjustments are based on actual claims experience and, had CNA properly managed the claims, Star's claims experience would have been more favorable, resulting in a reduced premium. (Id. at ¶ 11; Star's 56.1 Statement at ¶¶ 6, 10, 28). Finally, with regard to only the 1992-93 Policy, Star asserts that CNA applied the incorrect Maximum Retrospective Premium Factor, using 130% rather than 100% as is stated in the Policy. (Id. at ¶¶ 12-13, 23-28, 31). These defenses are addressed below.

## I. Statute of Limitations

Star asserts the statute of limitation as a defense only with regard to the 1992-93 Policy. In New York, the statute of limitations for a breach of contract claim is six years and the cause of action accrues at the time of the breach. N.Y. C.P.L.R. § 213(2); Shaftel, 39 F. Supp.2d at 226 (citing Raine v. RKO General, Inc., 138 F.3d 90 (2d Cir. 1998)). However, where a workers' compensation policy provides for payment of a retrospective premium based on actual claims experience, as in the present case, the six-year limitations period as applied to the collection of premiums accrues at the time of the adjustment. See Commissioners of the State Insurance Fund v. Trio Asbestos Removal Corp., 9 A.D.3d 343, 345, 780 N.Y.S.2d 362, 364 (2d Dep't 2004).

Here, the complaint was filed on March 5, 2001. The first annual adjustment for the 1992-1993 Policy was sent to Star on June 1, 1994. CNA does not seek to recover any premium for that time. (See Peterson Aff. at ¶ 37). Rather, CNA seeks only to recover for the subsequent

5

annual reconciliations of the 92-93 Policy, which were made on June 1, 1995, June 1, 1996 and June 1, 1997. These reconciliations were made and demanded within the six-year statute of limitations and are thus timely.

## II. CNA's Exclusion of Taxes and Assessments from the Maximum Premium Calculation

While the parties agree that the Policies are subject to a maximum premium, which is the highest retrospective premium that Star will have to pay CNA (Schmitt Aff. at ¶ 25; Peterson Aff. at ¶ 27; Kogel Aff. at ¶ 29), their dispute concerning the maximum premium centers around CNA's exclusion of taxes and assessments from the maximum premium calculation. CNA relies on the affidavit of Daniel Schmitt, an account manager in the Legal Collections Department of CNA, in which he asserts that assessments for the New York State Second Injury Fund ("NYSIF") and taxes are not factored into the maximum premium calculation and are separate charges in addition to the maximum premium. (Schmitt Aff. at ¶¶ 25, 29).[4] Star disputes this assertion, relying on the express terms of the Policies. (Kogel Aff. at ¶¶ 43-44; Policies together with Retrospective Premium Endorsement, annexed to the Kogel Aff. as Exs. B-D). Given that neither party has asserted that "taxes" are to be distinguished from "assessments" in calculating the maximum premium, the court will analyze them together. This treatment is compelled both

---

[4]The court has considered and rejects Star's argument that the Schmitt affidavit is inadmissible because it was not made based on personal knowledge. (Star Mem. at 9-12). Star's objection has previously been heard and denied by order dated April 1, 2004. Moreover, the law is clear that an affiant's personal observations over time may constitute personal knowledge. See Fed. R. Civ. Pro. 56(e); see, e.g., Searles v. First Fortis Life Insurance Co., 98 F. Supp.2d 456, 461 (S.D.N.Y. 2000) ("An affiant's conclusions based on personal observations over time, however, may constitute personal knowledge, and an affiant may testify as to the contents of records reviewed in her official capacity."); State of New York v. Saint Francis Hospital, 94 F. Supp.2d 423, 425 (S.D.N.Y. 2000) ("A witness's conclusions based on personal observations may constitute personal knowledge.").

6

by the parties' arguments as well as the fact that New York State Workers' Compensation Law § 15(h) requires that assessments "shall be deposited with the commissioner of taxation and finance . . . ."

A review of the Policies and Retrospective Premium Endorsements annexed thereto indicate that the retrospective premium is calculated by including taxes. The Retrospective Premium Endorsement provides at page 1, subsection (A) (5) that: "Taxes are a part of the premium we collect. Taxes are determined as a percentage of basic premium and converted losses." The endorsement further defines the retrospective premium as

> the sum of basic premium, converted losses, *and taxes*, . . . . The retrospective premium will not be less than the minimum nor more than the maximum retrospective premium. The minimum and maximum retrospective premium are determined by applying the minimum and maximum factors shown in the Schedule to the standard premium.

(Retrospective Premium Endorsement at page 2, subsection (C) (1-2) (emphasis added)). This provision makes clear that taxes are included in calculating the retrospective premium and of necessity must therefore be part of the maximum retrospective premium calculation. To argue otherwise defies common sense and ignores the plain meaning of the provision. Thus, the court finds that taxes and assessments are included in the maximum retrospective premium.

### III. CNA's Calculation of Retrospective Adjustments Based on Incurred Losses

The Policies provide that the retrospective premium calculation is to be based on actual or paid losses. Nonetheless, CNA contends that the parties agreed that the premium calculation

would convert from a "paid loss" to an "incurred loss" basis after 52 months.[5] (Schmitt Affidavit at ¶¶ 14-16, 20, 36, 47 and 54; CNA 56.1 Statement at ¶ 15 and documents cited therein). In support of its contention, CNA relies on three documents: (1) the premium finance agreements; the Claims Service Agreements; and the confirmation letters sent from CNA to Star's broker on Star's behalf for each of the Policies. The premium finance agreements provide, in relevant part:

> Upon completion of this reconciliation, the Insurer shall bill the Insured for the difference between the Insured's payments to date and the adjusted premium incurred under the Policies. ***Thereafter, annual incurred loss retrospective accounting adjustments under the Policies will commence and continue until final settlement under the policies.***

(Premium Finance Agreement, dated January 1993 at page 2, annexed to the Kogel Affidavit as "Ex. T ") (emphasis added). The Claims Service Agreements provide in relevant part:

> [A]s of 18 months after the policies' inception, or such other period as may be provided in an endorsement to the policy, and annually thereafter (the "Evaluation Date") and until final settlement, CNA will prepare a rating plan accounting reconciliation between the client's payments to date and the adjusted premium *incurred* under the policies, determined in accordance with the rating plan.

(Exs. D at ¶ 3 annexed to the Schmitt Affidavit) (emphasis added). The Confirmation Letters provide that: "Note: Under Paid-Loss Programs, the stated LCF will apply to *incurred losses* after the end of the paid loss period." (CNA 56.1 Statement at ¶ 5, Schmitt Affidavit at ¶¶ 35, 42 and 49 and Exs. E at page 8, J at page 8 and O at page 9 annexed thereto) (emphasis addded).

---

[5]The court notes that while the Schmitt affidavit states that the projected loss period is 52 months, the confirmation letters states that the projected loss period is 54 months. (Schmitt Aff. at ¶14 and Ex. E annexed thereto).

8

CNA argues that their insurance program is governed not only by the Policies but also by the finance agreements and Claims Service Agreements. CNA argues that these policies and agreements must be read together to determine the terms of the parties' agreement. Star urges this court to reject CNA's proffer of these agreements and confirmation letters to modify the terms of the Policies. Instead, Star argues that the Policies' terms, which make no mention of a conversion from paid to incurred losses and are unambiguous, should therefore be enforced as written. Moreover, Star asserts that to the extent that the finance agreements are inconsistent with the Policies, the ambiguity should be construed against the drafter, CNA. (Kogel at ¶ 38). Furthermore, according to Star, CNA's argument is belied by the fact that CNA almost exclusively utilized paid losses during the course of its administration of the policies. (Kogel Aff. at ¶ 42, citing Exs. U & V annexed thereto). The court disagrees.

Under New York law, "separate written agreements executed at the same time may be considered in law as one agreement, but only if the parties so intended." Lowell v. Twin Disc, Inc., 527 F.2d 767, 769-770 (2d Cir. 1975); Williams v. Mobil Oil Corp., 83 A.D.2d 434, 440, 445 N.Y.S.2d 172, 175 (2d Dep't 1981) ("[S]everal contracts *may* be construed as one, dependent upon the intent of the parties.")(emphasis in original). The Second Circuit has recognized that New York law requires that "all writings that form part of a single transaction and are designed to effectuate the same purpose be read together, even though they were executed on different dates . . . ." Gordon v. Vincent Youmans, Inc., 358 F.2d 261, 263 (2d Cir. 1965) (reversing grant of summary judgment finding that trier of fact must interpret the three contracts governing the same subject matter although executed six months apart); see also Commander Oil Corp. v. Advance Food Service Equipment, 991 F.2d 49 (2d Cir. 1993) ("Even

if the writings are executed at different times, . . . contracts should be interpreted together if 'the parties assented to all the promises as a whole so that there would have been no bargain whatever if any promise or set of promises had been stricken.'") (quoting Williston, Contracts, § 863 at 275 (3rd ed. 1970)); Nau v. Vulcan Rail & Constr. Co., 286 N.Y.188, 197, 36 N.E.2d 106, 110 (141) (finding that because the agreements at issue "were executed at substantially the same time, related to the same subject matter, [they] were contemporaneous writings and must be read together as one."). "'Determining whether contracts are separable or entire, the primary standard is the intent manifested, viewed in surrounding circumstances'", which is a question of fact. National Union Fire Insurance Co. of Pittsburge, P.A. v. Turtur, 892 F.2d 199, 204-05 (2d Cir. 1989) (reversing grant of summary judgment finding a material issue of fact as to whether the parties intended for the separate agreements at issue to be part of a single, overall contract, explaining that: "The issue of the dependency of separate contracts, therefore, boils down to the intent of the parties.") (quoting Rudman v. Cowles Communications, 30 N.Y.2d 1, 13, 330 N.Y.S.2d 42 (1972)); see also Dynamics Corp. of America v. Int'l Harvester Co., 429 F. Supp.341, 345-46 (S.D.N.Y. 1977); Kurz v. U.S., 156 F. Supp. 99, 103-04 (S.D.N.Y. 1957, aff'd 254 F.2d 811 (2d Cir. 1958) (per curiam). Given the fact that all three agreements were executed within the same time frame, namely in January 1993 and March 1993, the parties' intent with regard to whether retrospective premiums were to be based on incurred or paid losses is a question of fact. The trier of fact must resolve the issue of the parties' intent in this regard. Summers v. Guss, 7 F. Supp.2d 237 (W.D.N.Y. 1998) (denying summary judgment because extrinsic evidence raised material issues of fact with respect to interpretation of conflicting agreements between the parties).

## IV. TIC's Alleged Mismanagement of Claims

Star also contends that it does not owe CNA any additional premiums because TIC allegedly breached its "duties and obligations" under the Policies. (Star's R. 56.1 Statement at ¶¶ 10, 28 and 31). Specifically, Star alleges that the retrospective premiums sought are artificially inflated on account of TIC's mismanagement of claims. (Star's R. 56.1 Statement at ¶¶ 5, 10). CNA urges this court to reject Star's argument, relying on case law holding that "there is no cause of action or defense of the implied duty of good faith when the insured alleges that an inadequate investigation resulted in additional retrospective premiums." Liberty Mutual v. Thalle Construction Co., Inc., 116 F. Supp.2d 495, 502 (S.D.N.Y. 2000); see also Insurance Company of Greater New York v. Glen Haven Residential Health Care Facility, Inc., 253 A.D.2d 378, 676 N.Y.S.2d 176 (1st Dep't 1998) ("New York has never recognized a cause of action or defense for breach of an insurer's implied covenant of good faith and fair dealing where, as here, it is alleged that an insurer's failure to reasonably investigate claims made against the insured results in an increased retrospective premium.").

While CNA is correct that New York courts have routinely rejected an allegation of breach of an insurer's implied covenant of good faith and fair dealing as a defense for nonpayment of premiums, that law is largely inapplicable here. Star's allegation is that TIC breached its express obligations under the policies, and not any "implied" duties. (Star's Answer, generally; Star's Mem. in Opposition at page 14). Star has presented evidence of specific instances of claims mismanagement, including: (1) TIC failed to re-open closed cases bearing on apportionment and/or Workers' Compensation Law Section 15(8) issues (see Henry Reports for claimants Lawrence Regan and Frank Calo); and (2) TIC frequently delayed the

11

processing of claims resulting in significantly increased payments (see Henry Reports for claimants James Schwartz, Paul Navarra, Richard O'Brien, Herbert Hull, Thomas Jann, and Rod Ewart). The question of whether this evidence establishes TIC's mismanagement is a question of fact to be resolved at trial. See Commissioners of the State of New York Insurance Find v. Photocircuits Corp., 2005 WL 1357187, *5 (1st Dep't June 9, 2005) (finding factual question as to whether the insurer "met its basic obligation to perform its duties in a reasonable manner" precluded summary judgment).

### V. Value of the Maximum Retrospective Premium Factor for the 1992-93 Policy

Finally, with respect to only the 1992-93 Policy, the parties dispute the value of the Maximum Retrospective Premium Factor. The Maximum Retrospective Premium Factor is a multiplier used in calculating the premium. CNA bases its premium calculation on a Maximum Retrospective Premium Factor of 130%. Star claims that CNA's calculation is incorrect because the Maximum Retrospective Premium Factor is 100%. The Retrospective Premium Endorsement to the 1992-93 policy expressly states that the Maximum Retrospective Premium Factor is 100%. (Retro. Premium Endorsement at pg.3, annexed to the Kogel Aff. as "Exhibit B"). CNA asserts that the inclusion of the 100% figure was a mere typographical error. Star disputes that the inclusion of the factor valued at 100% is a typographical error. Star argues that even if CNA's assertion is correct that the inclusion of the 100% factor is a typographical error, New York State Insurance Law compels the conclusion that the factor must remain 100%. Moreover, Star asserts that CNA's claim of typographical error is belied by its submission of the 100% figure to the New York State Insurance Rating Board on March 25, 1993 and the Board's September 21, 2003 verification of the 100% Maximum Retrospective Premium Factor. (Exhibit

"P" annexed to the Schmitt Affidavit). This court agrees that it must look to New York State Insurance Law in resolving this issue.

It is undisputed that CNA sought and received confirmation of the 100% factor from the New York State Insurance Rating Board. New York State Insurance Law § 2305(b) requires that workers' compensation rates be filed with "the superintendent and shall not become effective unless either the filing has been approved or thirty days . . . have elapsed and the filing has not been disapproved." New York Insurance Law § 2305(b)(McKinney 2000 & 2005 Supplement). Insurance Law § 2314 provides that "[n]o authorized insurer shall . . . knowingly charge or demand a rate or receive a premium which departs from the rates, rating plans, classifications, schedules, rules and standards in effect on behalf of the insurer, or shall issue or make any policy or contract involving violation thereof." New York Insurance Law § 2314 (McKinney 2000). Similarly, Insurance Law § 2339(b) provides that ". . . no insurer . . . shall charge or receive any rate which deviates from the rates, rating plans, classifications, schedules, rules and standards made and filed by such . . . insurer . . . ." New York Insurance Law § 2339(b) (McKinney 2000). In addition, § 2339(c) authorizes an insurer to "make written application to the superintendent for permission to deviate from the rates, schedules, rating plans or rules filed on its behalf. . . [and] the application shall specify the basis for the modification . . . . If the superintendent finds the deviation to be justified, he shall approve it . . . ." New York Insurance Law § 2339(c) (McKinney 2000). Thus, under the controlling statutes, policy rates do not become effective until the insurer files its policy rates with the superintendent and such are approved either

13

affirmatively or by operation of law.[6] The statutes prohibit deviation from an approved rate, although an insurer may apply to the superintendent to modify approved rates. Thus, the insurer's submission of the Maximum Premium Factor valued at 100% and the State Insurance Board's verification thereof, together with the insurer's failure to apply to the superintendent for permission to deviate from the approved 1.0 rate as expressly required by Insurance Law § 2339, compels the court to find that the value of the Maximum Premium Factor for the 1992-93 policy is 100% or 1.0 as a matter of law.

This court previously addressed the issue of which factor applies in deciding Star's summary judgment motion. (See Memorandum and Order, dated September 21, 2004). Based on counsel's submissions, the court ruled that the value of this factor is a factual question precluding summary judgment. However, because the parties' submissions now more fully fleshed out this issue, the court revisited this question.

---

[6]While there are few reported cases interpreting these sections, courts have recognized under the predecessor statute to Section 2314, that "insurers are forbidden to charge or receive rates which deviate from those filed with the Superintendent." Public Service Mutual Insurance Co. v. Rosebon Realty Co., 39 Misc.2d 663, 664, 241 N.Y.S.2d 555, 557 (Civil Ct., N.Y. County 1963) (explaining that "insurers are forbidden to charge or receive rates which deviate from those filed with the Superintendent. The filed rates thus have the force of law and any agreement changing or varying such rates would be invalid."); see also American Motorists Insurance Co. v. New York Seven-Up Bottling Co., 18 A.D.2d 36, 238 N.Y.S.2d 80 (1st Dep't 1963) (explaining that where insurance premium rates were properly filed, the insurer cannot deviate from those rates and that "[n]o inadvertence or mistake of the insurance company can prevent the collection of the proper premium."); Stephen Peabody, Jr. & Co., Inc. v. Travelers Insurance Co., 240 N.Y.511, 148 N.E.661 (1925) (recognizing that, under the predecessor statute, rates for workers' compensation premiums must be fixed by the Superintendent of Insurance and finding it "impossible for the [insurer] to fix a rate . . . which did not have the approval of the State authorities.").

## B. TTS's Breach of Contract Claim for Fees Allegedly Due Under the Claims Service Agreements

CNA alleges that TTS entered into three Claims Service Agreements with Star to service the insurance policies sold to Star by TIC for the periods November 28, 1992 through November 28, 1995. (Second Supplemental and Amended Compl. at ¶ 10). CNA claims Star breached the agreements in that Star has refused to pay the service fees pursuant to the claims service agreements. (Id. at ¶¶ 11-12). Star denies that it owes anything further in claims service fees and asserts a counterclaim against CNA alleging that TTS breached the Claims Service Agreements "by failing to *service* the claims as provided in the agreements." (Ans. at ¶¶ 4-5, 28- 29) (emphasis added).

Here, the Claims Service Agreements do not define the term "service" nor do they recite any specific duties to be performed by TTS in servicing the claims. As a threshold matter, the Claims Service Agreements are governed by Illinois law. (See 1992-93 Claims Service Agreement at ¶ 18; 1993-94 Claims Service Agreement at ¶ 12; and 1994-95 Claims Service Agreement at ¶ 13). Under Illinois law, a contract is ambiguous "when key contract language is susceptible to more than one reasonable interpretation when the contract is read as a whole." Id. (citations omitted). Whether a contract is ambiguous is a question of law for the court to determine. R.T. Hepworth Co. v. Dependable Ins. Co., Inc., 997 F.2d 315, 318 (7th Cir. 1993). "Once the court determines that a provision is ambiguous, the construction of a particular provision becomes a question of fact." Alexian Bros., 330 F. Supp.2d at 974 (citations omitted).

Because reasonable minds could disagree as to the meaning of "service" in the context of the Claims Service Agreement, the contract is ambiguous. Thus, a trial is necessary to allow the

15

parties to present evidence as to what was intended by the term "service" as stated in the Claims Service Agreements. Accordingly, the plaintiffs' motion for summary judgment on its claim regarding the Claims Service Agreement is denied.

**C.     Unjust Enrichment Claim**

Plaintiffs' complaint alleges a common law claim for unjust enrichment. Plaintiffs allege that they "have paid certain obligations of the defendant and have provided certain services to the defendant for which the defendant has refused to pay and the defendant has been unjustly enriched thereby." (Compl. at ¶¶ 21-22). Star denies the allegation. (Ans. at ¶ 11).

Under New York and Illinois law, the law being the same in both jurisdictions, the existence of a valid and enforceable written contract precludes recovery on a theory of unjust enrichment. See, e.g., MacDraw, Inc. v. The CIT Group Equipment Financing, 157 F.3d 956 (2d Cir. 1997) (affirming dismissal of unjust enrichment claim where an enforceable written contract governed the subject matter at issue); Bates Advertising USA, Inc. v. McGregor, 282 F. Supp.2d 209, 216-217 (S.D.N.Y. 2003) (dismissing unjust enrichment claim "because there is a contract between the parties that covers the disputed subject matter") (citing Clark-Fitzpatrick, Inc. v. Long Island Rail Road Co., 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190, 193 (1987) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter")); Murray v. ABT Associates, Inc., 18 F.3d 1376 (7th Cir. 1994) (affirming dismissal of unjust enrichment claim because "Illinois does not permit recovery on a theory of quasi-contract when a real contract governs the parties' relations"); First Commodity Traders, Inc. v. Heinold Commodities, Inc., 766 F.2d 1007 (7th Cir. 1985) ("Under Illinois law, a plaintiff may not state a

claim for unjust enrichment when a contract governs the relationship between the parties.").

Given that there is no dispute that the Policies and the Claims Service Agreements are valid, enforceable contracts and that the parties' dispute arises thereunder, a claim for unjust enrichment is not cognizable. Thus, plaintiffs motion for summary judgment on this ground is denied and the unjust enrichment claim is dismissed.

### D. Account Stated Claim

The fourth count of plaintiffs' complaint alleges that Star owes $1,822,604.00 on the theory of an account stated. (Compl. at ¶ 24).[7] CNA alleges that Star promised to pay that sum upon demand, and, despite such demand, Star has not made payment. (Compl. at ¶¶ 24-25). Star denies these allegations. (Answer at ¶¶ 12-13). The amount allegedly due is comprised of the premiums allegedly owed under the Policies and the fees for servicing the claims pursuant to the Claims Service Agreements. As noted earlier, the insurance policies are governed by New York law and the claims service agreements are governed by Illinois law. Thus, the court will first analyze the account stated claim for premiums allegedly due under the Policies under New York law and then the fees allegedly owing pursuant to the Claims Service Agreements under Illinois law.

Under New York law, "[a]n account stated exists where a party to a contract receives bills or invoices and does not protest within a reasonable time." Bartning v. Bartning, 16 A.D.3d 249, 250, 791 N.Y.S.2d 541, 541-542 (1st Dep't 2005) (citing Herrick, Feinstein LLP v. Stamm, 297 A.D.2d 477, 746 N.Y.S.2d 712 (1st Dep't 2002)); see also Samara v. Gangemi & Gangemi, No.

---

[7]The court notes that plaintiffs have amended their complaint to reflect that the sum allegedly owed has increased to $2,622,062.00 as a result of the June 1, 2003 retrospective adjustment for the premiums and claims servicing fees.

17

02 CV 1407 (RML), 2005 WL 1076320 (E.D.N.Y. May 3, 2005).

Here, plaintiffs have not established entitlement to summary judgment on their account stated claim. Notably absent from the record is any evidence of invoices sent to Star reflecting the balance allegedly due. Rather, the only invoices submitted to the court are those reflecting amounts actually *paid* by Star. (See Plaintiffs' R. 56.1 Statement at ¶¶ 17, 37 and 54 and exhibits cited therein). Thus, in the absence of any evidence of bills or invoices presented to Star for the monies now sought, plaintiffs' motion for summary judgment on the account stated claim must fail.

Moreover, even if plaintiffs had presented evidence of the invoices submitted to Star, the uncontroverted evidence that Star objected to the amount sought is sufficient to warrant dismissal of the account stated claim. Given that Star's broker, Angelo Caleco, testified that he repeatedly objected to CNA regarding the bills for additional premium on behalf of Star and at the specific direction of Star's controller, Phyllis Valenti, there is evidence that Star protested the amount sought by plaintiffs. (See Caleco Depo. at pp. 54-57, 68-70 annexed to the Brandt Aff. as "Ex. B"; see also Valenti Depo. at pp. 131-33, 158-169, 200-203, 213-17, annexed to Brandt Aff. as "Ex. A").

Turning next to issue of whether the plaintiff is entitled to summary judgment on its claim for an account stated based on the Claims Service Agreements, the court must apply Illinois law. Under Illinois law, an account stated "determines the amount of a preexisting debt when parties who previously have conducted monetary transactions agree that there truly is an account representing the transactions between them and one party renders a statement of account to another who retains that statement beyond a reasonable time without objection." ITQ Lata,

LLC v. MB Financial Bank, N.A., 317 F. Supp.2d 844, 858 (N.D. Ill. 2004). By retaining the statement of account for an unreasonable time without objection, the receiving party acknowledges that the balance is accurate and due. Id. (citing Motive Parts Co. of America, Inc. v. Robinson, 53 Ill. App. 3d 935, 941, 369 N.E.2d 119, 124 (1st Dist. 1977) (an account stated is "merely a final determination of the amount of an existing debt").

As with the account stated claim for the allegedly outstanding Policy premiums discussed above, the record is devoid any evidence of invoices sent to Star reflecting the balance allegedly due for fees under the Claims Service Agreements. Again, in the absence of any evidence of bills or invoices presented to Star for the money now sought under the Claims Service Agreements, plaintiffs' motion for summary judgment on the account stated claim must fail. Moreover, because the Claims Service Agreements expressly state that the claim service fee stated therein is an "estimate" and the actual fees due "may vary from the amount estimated herein according to actual loss experience", TTS has not established, as a matter of law, that the fees stated in its Claims Service Agreements constitute an account stated. (See 1992-93 Claims Service Agreement at pp.1, 8; 1993-94 Claims Service Agreement at pp. 1, 2, 7; 1994-95 Claims Service Agreement at p.2 and Schedule 1). To the extent each claims service fee was subject to change based on actual losses, none "rendered certain the amount of a debt for preexisting liability" as required for an account stated. Toth, 207 Ill. App.3d at 672, 566 N.E.2d at 735. Thus, summary judgment on the account stated claim as to both the Policies and the Claims Service Agreements is denied and the claim is dismissed.

## CONCLUSION

As detailed above, CNA's motion for summary judgment is **DENIED**. For the reasons detailed above:

(1) CNA's claims for unjust enrichment and an account stated are **DISMISSED**;

(2) The court finds that taxes and assessments are included in the maximum premium;

(3) The court finds that the value of the Maximum Retrospective Premium Factor for the 1992-93 Policy is 1.0 or 100%;

(4) The issue of whether retrospective adjustments are to be based on paid or incurred losses is a factual question to be resolved at trial;

(5) The issue of whether TIC mismanaged the claims is a factual question to be resolved at trial; and

(6) The issue of whether TTS breached the claims service agreements is a factual question to be resolved at trial.

**SO ORDERED.**

Dated: Central Islip, New York
      July 28, 2005

/s/
ARLENE ROSARIO LINDSAY
United States Magistrate Judge